ORIGINAL

IN THE SUPREME COURT OF OHIO

STATE OF OHIO,

      Plaintiff-Appellee      :

   vs.                :

MARK A. BARCLAY,          :

      Defendant-Appellant    :

                     :

Case No. _____

C/A Case No. 21336

ON APPEAL FROM THE NINTH
DISTRICT COURT OF APPEALS
OF SUMMIT COUNTY, OHIO

---

DEFENDANT-APPELLANT"S MEMORANDUM IN SUPPORT OF JURISDICTION

---

MARK A. BARCLAY #A434-816
Mansfield Correctional Institution
P.O. Box 788
Mansfield, Ohio 44901

SUMMIT COUNTY PROSECUTOR
53 University Avenue
Akron, Ohio 44308
Phone: (330)643-2788

DEFENDANT-APPELLANT   PRO SE

COUNSEL FOR PALINTIFF-APPELLEE

FILED

DEC 0 1 2003

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

EXHIBIT
13

# TABLE OF CONTENTS

Pages

EXPLANATION OF WHY THIS CASE IS A CASE OF PUBLIC OR GREAT
GENERAL INTEREST AND INVOLVES A SUBSTANTIAL CONSTITIONAL
QUESTION ..................................................... iii,iv

TABLE OF AUTHORITIES ......................................... i, ii

STATEMENT OF THE CASE AND FACTS .............................. v,vi, vii,
                                                              viii, ix,

LAW AND ARGUMENT ............................................. 1 to 6

PROPSITION OF LAW NUMBER ONE ................................. i, 1

    WAS APPELLANT'S CONVICTIONS AGAINST THE MANIFEST WEIGHT OF
    THE EVIDENCE ............................................. 1

CONCLUSION ................................................... 6

PROOF OF SERVICE ............................................. 7

APPENDIX:

Notice of Appeal ............................................. 1

Journal Entry of October 25, 2002 ........................... 2-3

Journal Entry of October 28, 2002 ........................... 4-5

Journal Entry of November 5, 2002 ........................... 6

R. C. 2923.03 ............................................... 7

## TABLE OF AUTHORITIES

CASES:                                                                Pages

State v. Otten (1986) 33 Ohio App. 3d 339 ..................    1

## STATE STATUTES AND OTHER AUTHORITIES

R.C. 2923.03 ................................................    7

EXPLANATION OF WHY THIS CASE IS A CASE OF PUBLIC OR GREAT GENERAL
INTEREST AND INVOLVES A SUBSTANTIAL CONSTITUTIONAL QUESTION.

Both Article I, Section 10 and 16 of the Ohio Constitution, and
the Sixth and Fourteenth Amendments to the United States Constitution
guarantees a criminal defendant the fundamental right to due process
and a fair trial. The criminal defendant is further guaranteed that
his substantive rights will be protected at all times during the course
of the criminal proceedings and the trial had against him as the interest
and demands for justice requires. It is additionally stated that the
public has a vested interest in mainting the integrity of the judiciary,
the fair administration of justice, and that the judgments and decisions
of the Courts will serve the ends of justice and produce a reliable
result. However, these basic precepts as guaranteed and protected
under the Constitutions of the State of Ohio, and the United States
are both weaken and eroded where the criminal defendant is deprived of
fundamental fairness and striped of the due process protection afforded
to him during trial.

In the case sub judice, there was never any physical, scientific
or forensic evidence presented during trial in which to support the
charges which Appellant was tried and convicted. Instead, the state
relied entirely upon uncorroborated testimony of Appellant's alleged
co-defendants and that being the essential evidence in which the state
and the jury relied in finding Appellant guilty of the crimes in which
he was charged. The alleged co-defendants' testimony must be deem
suspicious and unreliable as each co-defendant admitted to entering a
plea agreement with the state prior to trial for reduced sentences in

iii

exchange for their testimony against Appellant.  The so-called alleged co-defendants were also admitted drug abusers who sold and used crack cocaine, that is, they were all crack addicts whith a criminal history for drug abuse and various convictions for drug related crimes which only serve to add to the overall unreliability of their uncorroborated testimony.  In light of the fact that Appellant asserted an alibi defense and called several witnesses who testified that Appellant's alleged co-defendants had made pretrial statements to the effect that Appellant had no involvement in the crimes, Appellant should not have been convicted of the crimes charged based on the uncorroborated in-court testimony of his alleged co-defendants.  Based on the above reasons Appellant asserts that his substantive rights were not adequately protected and he was further denied his fundamental right to due process and a fair trial as guaranteed under the Constitutions of the State of Ohio, and the United states.  It is further stated that the Court should exercise its discretion to review this case on appeal because it is one of public or great general interest as the public has a vested interest in ensuring whenever a citizen of this state is charged with a crime and brought before the Court his fundamental right to a fair and impartial trial will be protected and in order to preserve and to protect the fair administration of justice and the integrity of the judiciary.

## STATEMENT OF THE CASE AND FACTS

On November 17, 2001, the body of a man latter identified as Micthell Strodes was found in a culvert below a highway bridge in Akron, Ohio (TOP at 13-14,36). The body was rapped in sheets, and convered by a board (TOP at 17-18). An autopsy revealed that the cause of death was multiple blunt injuries to the head by an assailant or assailants (TOP at 576-577). The time of death was determined to have been up to two weeks earlier (TOP at 578).

Police investigations into Mr. Strodes's death eventually lead to the arrest and indictment of five people on multiple charges. Maynard W. Nellte, Kimberly A. Martin, Denni B. Payne, Robert E. Greathouse, and Appellant Mark A. Barclay. AS relevant herein, Appellant was charged with Aggravated murder, R.C. 2901, latter reduced at trial upon motion of the state to Murder, R.C. 2903.02 (TOP at 11), two counts of Kidnapping, R.C. 2905.01(A)(3), and Abuse of a Corpse, R.C. 2927.01(B). Prior to trial, all of Appellant's co-defendants, all charged similarly, plead guilty to reduced and sentences on the condition that they testify at trial.

Trial in Summit County Common Pleas Court commenced on October 15, 2002. At trial, there was no physical or forensic evidence presented to link Appellant to these crimes. The only evidence presented against Appellant was the testimony of his co-defendants and one other witness who had been charged separately with misdemeanor failure to report a crime and onstruction of justice for her involvement.

Jennifer Wohlford testified that on November 6, 2001, she was at Denni Payne's house at 703 Tahyer Street in Akron, Ohio (TOP at 178). Kimberly Martin was there, and before Martin left to get license plates in Canton, Mitchell Strodes arrived at the house. Strodes asked Martin if there was any work he could do for her, and Martin told him to transfer some of her belongings from one car to another car in the garage (TOP at 179). Wohlford stayed at the house to prepare dinner while Martin,

v

Nettle, and Greathouseleft for Canton (TOP at 179).

When Martin, Nettle, and Greathouse returned to Payne's house, Martin discovered that most of the items she had asked Strodes to transfer were missing (TOP at 182-183). Martin began yelling in anger about Strodes, when Appellant allegedly arrived at the house. Appellant allegedly offered to go find Strodes for Martin, and to "take care of him for you" (TOP at 183-184). Instead, Strodes returned to the house at that time (TOP at 184). Martin began yelling at Strodes, who denied taking anything. Martin then grabbed an ASP (collapsible baton) from somewhere and hit Strodes in the head (TOP at 185). wohlford ran upstairs and when things got quiet, she came back down. She then allegedly saw Appellant holding Strodes, while Martin continued to yell and punch Strodes (TOP at 185). After running back upstairs and coming down again, Wohlford alleged that she saw Appelant punching Strodes repeatedly so she ran upstairs a third time (TOP at 186). When she was finally able to leave the house to go to work, Wohlford saw Strodes lying on the floor mumbling (TOP at 188).

Wohlford admitted that her misdemeanor charges would be dismissed for her test-imony (TOP at 191). She also admitted to a prior felony drug conviction and a mis-demeanor theft conviction (TOP at 192).

Denni Payne testified that when he came home from work on November 6, he saw Martin and Nettle in the garage talking about the missing items, and saw his car trunk open (TOP at 209). When Martin and Nettle went into the house, Payne stayed in the garage to clean up. Payne saw Strodes walking up the driveway, and he told him that Martin wanted to see him (TOP at 210-211). He then heard a lot of commotion from the house, and tried to get inside, but the door was blocked. after finally pushing his way inside, Payne saw Appellant holding Strodes by the arms, while Martin hit Strodes with the ASP (TOP at 211-212). After Strodes fell to the floor, Payne saw the other co-defendants take turns asking Strodes questions, yelling at him, and occasionally kicking him (TOP at 213). Payne pleaded with the others to stop,

and they all took a break to smoke crack cocaine (TOP at 214).

Payne alleged that Appellant then began an unsuccessful attempt to tie up Strodes, then asked if anyone had a gun (TOP at 216). The co-defendants then took turns standing on Strodes in an attempt to forces the air out of him (TOP at 217-218). Payne was asked for a sheet so he retrieved an old painting sheet from the basement then went outside (TOP at 218-219). Payne then saw Barclay and Nettle carry Strodes out wrapped in the sheet and put him in the trunk of Payne's car, which Payne backed up to the rear of the house. Appellant and Nettle allegedly then drove off (TOP at 220-221). Strodes was still alive when he was driven away (TOP at 223).

Payne was allowed to plead guilty to reduced charges of Involuntary manslaughter and aggravated assault, for a total sentence of five years imprisonment in exchange for his testimony (TOP at 225).

Kimberly Martin testified that she sold crack cocaine out of Payne's house, and that Appellant would help her out (TOP at 284, 287-288). when she told Appellant that her things had been stolen, Appellant allegedly said "I am going to kill that motherfucker for ripping you off" (TOP at 292). Martin admitted hitting Strodes with the ASP several times then dropping it and continuing to punch him. Martin stopped when she had an asthma attack, and Nettle, and Greathouse, and Appellant allegedly continued the beating (TOP at 293-294). Her testimony about subsequent events was similar to Payne's (TOP at 295-300).

Martin admitted to prior felony drug and trafficking convictions as well as a misdemeanor obstruction of official business conviction (TOP at 309). She also was allowed to plead to reduced charges of involuntary manslaughter and aggravated assault for a total sentence of six years imprisonment for her testimony (TOP at 310).

Robert Greathouse also admitted participating in the beating, named all co-

defendants as particpants, and said that he heard Strodes still talking as he was put into the trunk of the car (TOP at 373-380). Greathouse also was allowed to plead to reduced charges of involuntary manslaughter and aggravated assault for a total sentence of five years imprisonment for his testimony (TOP at 382-383).

Maynard Nettle testified that after Strodes was paut in the trunk. Appellant told him to drive and Appellant would tell him where to go (TOP at 415). As he was driving, he heard noises coming from the trunk (TOP at 416). When they stopped by the culvert udner the bridge, Nettle tried to open the trunk but could not because the lock was broken. As he went back into the car to look for a screwdriver, he heard a noise and saw Appelant allegedly hitting Strodes with a jack stand. Appellant allegedly said "We don't have to worry about that, he is dead now" (TOP at 417-418).

Greathouse was allowed to plead guilty to a reduced charge of involuntary manslaughter and one count of kidnapping for a sentence of twelve years imprisonment in return for his testimony (TOP at 420-422).

Appellant did not take the witness stand in his own defense. However, the defense offered an alibi defense and presented witnesses on his behalf. The first, Sandra Vinson Saunders, testified that she did not know Appellant personally, but while she was in the Summit County Jail she had several conversations with Kimberly Martin about the murder and Appellant. Martin told her that Appellant had nothing to do with the murder, and that she had made a deal to testify against him for the reduced sentence (TOP at 532-536).

Patrick Goodman testified that he knew all of the co-defendants (TOP at 602-603). He characterized all four of Appellant's co-defendants as violent crack cocaine users (TOP at 606-611). Appellant Barclay was not a violent person, and was a friend of Strodes (TOP at 612-613). While Goodman was a frequent visitor to Payne's house where Martin sold cocaine, he never saw Appellant there (TOP at 614-615). Goodman testified that he was paid by Martin to watch Strodes move items from car to car

and to rake leaves in the yard (TOP at 617-618).  After completing herese tasks, Goodman secured the garage and they left together (TOP at 619).

Sometime before Thanksgiving Goodman moved into Payne's house.  On Thanksgiving night, Martin confessed to Goodman that she had killed Strodes (TOP at 625).  Martin named the people that were with her in that incident, but did not name Appellant (TOP at 626).  Greathouse also told him of his involvement in the crime, but did not name Appellant (TOP at 629).  Wohlford also talked to Goodman about the crime, and named Greathouse, Nettle, Payne, Martin, and two others named "Doug" and one Norman Barnes, but did not name Appellant (TOP at 631).  When he was living at Payne's house, Goodman was shown a videotape of the murder of Strodes, in which he saw all the co-defendants but Appellant involved in the crime (TOP at 632-633).  Although Goodman could not see the face of the person taksing the videotape, he recognized his voice as a black man known to him as Brother Man (TOP at 663).

The jury returned verdicts of guilty on all counts.  Appelant was sentenced to the mandatory fifteen years to life imprisonment for Murder, eight years on each count of Kidnapping, and ten months for Abuse of a Corpse.  The sentences for Kidnapping and Abuse of a Corpse were to run concurrently, but consecutively to the sentence for Murder (TOP at 742-743), and amended by journal entries on October 28, and November 5, 2002 (Exs. C and D; Appx. at 4-6).

<u>LAW AND ARGUMENT</u>

<u>PROPOSITION OF LAW NUMBER ONE</u>

WAS APPELANT'S CONVICTIONS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

To Determine whether a conviction is against the manifest weight of the evidence:

> An appellate court must review the entire record, weight the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

**State v. Otten** (1986), 33 Ohio App. 3d 339, 340.  A review of the pertinent facts and evidence at trial will show that the jury lost its way and created manifest injustice in relying on the testimony of alleged accomplishes and disregarding the evidence that Appellant was not even at the scene of the crime.

As recounted in the Statement of the Case and Facts, the relevant facts are as follow:  Jennifer Wohlford testified that on November 6, 2001, she was at Dennie Payne's house at 703 Thayer Street in Akron, Ohio (T. Tr. 178).  Kimberly Martin was there, and before Martin left to get license plates in Canton, Mitchell Strodes arrived at the house. Strodes asked Martin if there was any work he could do for her, and Martin told him to transfer some of her belongings from one car to another car in the garage (T. Tr. 179).  Wohlford stayed at the house to prepare dinner while Martin, Nettle, and Greathouse left for Canton (T. Tr. 180).

When Martin, Nettle, and Greathouse returned to Payne's house, Martin discovered that most of the items she had asked Strodes to transfer were missing (T. Tr. 182-183). Martin began yelling in anger about Strodes, when Appellant allegedly arrived at the house. Appellant allegedly offered to go find Strodes for Martin and to "take care of him for you" (T. Tr. 183-184). Instead, Strodes returned to the house at that time (T. Tr. 184). Martin began yelling at Strodes, who denied taking anything. Martin then grabbed an ASP (collapsible baton) from somewhere and hit Strodes in the head (T. Tr. 185). Wohlford ran upstairs and when things got quiet, she came back down. She then allegedly saw Appellant holding Strodes, while Martin continued to yell and punch Strodes (T. Tr. 185). After running back upstairs and coming down again, Wohlford alleged that she saw Appellant punching Strodes repeatedly so she ran upstairs a third time (T. Tr. 186). When she was finally able to leave the house to go to work, Wohlford saw Strodes lying on the floor, mumbling (T. TR. 188).

Wohlford admitted that her misdemeanor charges would be dismissed for her testimony (T. Tr. 191). She also admitted to a prior felony drug conviction and a misdemeanor theft conviction (T. Tr. 192).

Dennie Payne testified that when he came home from work on November 6, 2002, he saw Martin and Nettle in the garage talking about the missing items and saw his car trunk open (T. Tr. 209). When Martin and Nettle went into the house, Payne stayed in the garage to clean up. Payne saw Strodes walking up the driveway and he told him that Martin wanted to see him (T. Tr. 210-211). He then heard a lot of commotion from the house, and tried to get inside, but the

-2-

door was blocked.  After finally pushing his way inside, Payne saw
Appellant holding Strodes by the arms while Martin hit Strodes with
the ASP (T. Tr. 211-212).  After Strodes fell to the floor, Payne saw
the other co-defendants take turns asking Strodes questions, yelling
at him, and occasionally kicking him (T. Tr. 213).  Payne pleaded with
the others to stop, and they all took a break to smoke crack cocaine

(T. Tr. 214).

Payne alleged that Appellant then began an unsucessful attempt
to tie up Strodes, then asked if anyone had a gun (T. Tr. 216).  The
co-defendants then took turns standing on Strodes in an attempt to
force the air out of him (T. Tr. 217-218).  Payne was asked for a
sheet, so he retrieved an old painting sheet from the basement, then
went outside (T. Tr. 218-219).  Payne then saw Barclay and Nettle
carry Strodes out wrapped in the sheet, and put him in the trunk of
Payne's car, which Payne backed up to the rear of the house.  Appellant
and Nettle allegedly then drove off (T. Tr. 220-221).  Strodes was
still alive when he was driven away (T. Tr. 223).

Payne was allowed to plead guilty to reduced charges of Involun-
tary manslaughter and aggravated assault, for a total sentence of
five (5) years of imprisonment in exchange for his testimony (T. Tr.
225).

Kimberly Martin testified that she sold crack cocaine out of
Payne's house, and that Appellant would help her out (T. Tr. 284,
287-288).  When she told Appellant that her things had been stolen,
Appellant allegedly said " I am going to kill that motherfucker for
ripping you off" (T. Tr. 292).  Martin admitted hitting Strodes with
the ASP several times then dropping it and continuing to punch him.
Martin stopped when she had an asthma attack, and Nettle, and Greathouse

-3-

and Appellant allegedly continued the beating (T. Tr. 293-294). Her testimony about subsequent events was similar to Payne's (T. Tr. 295-300).

Martin admitted to prior felony drug and trafficking convictions as well as a misdemeanor obstruction of official business (T. Tr. 300). She also was allowed to plead to reduced charges of involuntary manslaughter and aggravated assault for a total sentence of six (6) years imprisonment for her testimony (T. Tr. 310).

Robert Greathouse also admitted participating in the beating, named all co-defendants as participants and said that he heard Strodes still talking as he was put into the trunk of the car (T. Tr. 373-380). Greathouse also was allowed to plead to reduced charges of involuntary manslaughter and aggravated assault for a total sentence of five (5) years imprisonment for his testimony (T. Tr. 382-383).

Maynard Nettle testified that after Strodes was put in the trunk, Appellant told him to drive and Appellant would tell him where to go (T. Tr. 415). As he was driving, he heard noises coming from the trunk (T. Tr. 416). When they stopped by the culvert under the bridge, Nettle tried to open the trunk but could not because the lock was broken. As he went back into the car to look for a screwdriver, he heard a noise and saw Appellant allegedly hitting Strodes with a jack stand. Appellant allegedly said, " We don't have to worry about that, he is dead now" (T. Tr. 417-418). They pulled the body from the trunk, placed it in the culvert, put some building material and debris on top, and returned to Payne's house where Appellant left on foot (T. Tr. 418).

Greathouse was allowed to plead guilty to a reduced charge of involuntary manslaughter and one count of kidnapping for a sentence of twelve (12) years imprisonment in return for his testimony (T. Tr. 440-422).

Appellant did not take the witness stand in his own defense. However, the defense offered an alibi defense and presented witnesses on his behalf. The first, Sandra Vinson Saunders, testified that she did not know Appellant personally, but while she was in the Summit County Jail she had several conversations with Kimberly Martin about the murder and Appellant. Martin told her that Appellant had nothing to do with the murder, and that she had made a deal to testify against him for the reduced sentence (T. Tr. 532-536).

Patrick Goodman testified that he knew all of the co-defendants (T. Tr. 602-630). He characterized all four of Appellant's co-defendant as violent crack cocaine users (T. Tr. 606-611). Appellant Barclay was not a violent person and a friend of Strodes (T. Tr. 612-613). While Goodman was a frequent visitor to Payne's house where Martin sold cocaine, he never saw Appellant there (T. Tr. 614-615). Goodman testified that he was paid by Martin to watch Strodes move items from car to car and to rake leaves in the yard (T. Tr. 617-618). After completing these tasks, Goodman secured the garage and they left together (T. Tr. 619).

Sometime before Tanksgiving Goodman moved into Payne's house. On Thanksgiving night, Martin confessed to Goodman that she had killed Strodes (T. Tr. 625). Martin named the people that were with her in that incident, but did name Appellant (T. Tr. 626). Greathouse also told him of his involvement in the crime, but did not mention Appellant (T. Tr. 629). Wohlford also talked to Goodman about the crime, and named Great-hosue, Nettle, Payne, Martin, and two others named "Doug" and one Norman Barnes, but did not name Appellant (T. Tr. 631). When he was living at Payne's house, Goodman was shown a videotape of the murder of Strodes

-5-

in which he saw all the co-defendants but Appellant involved in the crime (T. Tr. 632-633).  Although Goodman could not see the face of the person taking the videotape, he recognized his voice as a black man known to him as Brother Man (T. Tr. 663).

R. C. 2923.03(D) requires that the testimony of an alleged accomplice be taken with grave suspicion and be weighed with great caution.  The fact that all witnesses against Appellant plead to lesser charges and sentences in exchange for their testimony against Appellant makes their testimony highly suspicious and unreliable.  As the only evidence against Appellant was the testimony of these witnesses, Appellant's convictions should have beeen reversed by the lower Appellate Court and the cause remanded for a new trial.

## CONCLUSION

Based on the foregoing reasons and the applicable law  the convictions warrants reversal under the circumstances and the Court is respectfully requested to exercise its discretion to grant Appellant's request for appellate review as this case raises a substantial constitutional question, involves a felony, and is one of public or great public interest.

It is so prayed.

Respectfully Submitted

*Mark A. Barclay*

MARK A. BARCLAY #434-816   PRO SE
Mansfield Correctioanl Institution
P. O. Box 788
Mansfield, Ohio 44901

## PROOF OF SERVICE

I hereby certify that a true copy of Defendant-Appellaant's notice of
appeal and memorandum in support of jurisdiction has been forwarded to
the Summit County Prosecuting Attorney, 53 University Avenue, Akron,
Ohio via regular United States Mail, this ___26___ day of November,
2003.

_Mark A. Barclay_
MARK A. BARCLAY        #434-816        PRO SE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# A  P  P  E  N  D  I  X

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

OPY

2002 NOV 22 AM 0:43

SUMMIT COUNTY
CLERK OF COURTS

IN THE COURT OF COMMON PLEAS
SUMMIT COUNTY, OHIO

STATE OF OHIO                    )    CASE NO. CR-02-02-0305(C)
                                 )
            Plaintiff/Appellee   )    JUDGE SCHNEIDERMAN
                                 )
v.                               )
                                 )
MARK A. BARCLAY                  )    NOTICE OF APPEAL
                                 )
            Defendant/Appellant  )    21336

Now comes the Defendant, MARK A. BARCLAY, by and through court-appointed

counsel, and hereby enters his NOTICE OF APPEAL to the Ninth District Court of Appeals from

the final judgment of conviction and sentence entered in this cause on October 25, 2002. Costs are

to be waived due to Defendant's indigency.

                                 _____
                                 NICHOLAS SWYRYDENKO (0042017)
                                 Attorney for Defendant/Appellant
                                 Ridgewood Centre, Suite 105
                                 1000 S. Cleveland-Massillon Rd.
                                 Akron, Ohio 44333
                                 (330) 666-6400

1



OPY

COPY

DIANA ZALESKI

# IN THE COURT OF COMMON PLEAS
## COUNTY OF SUMMIT

2002 OCT 25 AM 8: 44

SEPTEMBER

02

_____ Term 20 _____

SUMMIT COUNTY
CLERK OF COURTS

THE STATE OF OHIO
vs.

No.        CR 02 02 0305 (C)

MARK A. BARCLAY

## JOURNAL ENTRY

THIS DAY, to-wit: The 24th day of October, A.D., 2002, now comes the Prosecuting Attorney on behalf of the State of Ohio, the Defendant, MARK A. BARCLAY, being in Court with counsel, KERRY O'BRIEN and ANNALISA WILLIAMS, for trial herein. Heretofore on October 15, 2002, a Jury was duly empanelled and sworn, and the trial commenced and not being completed, adjourned and reconvened on October 17, 18, and 21, 2002, and concluded on October 22, 2002, at which time the Jury having heard the testimony adduced by both parties hereto, the arguments of counsel and the charge of the Court, retired to their room for deliberation.

And thereafter, to-wit: On October 24, 2002 at 9:25 A.M., said Jury came again into the Court and returned their verdict in writing finding said Defendant GUILTY of the crime of AGGRAVATED MURDER, as contained in Count 1 of the Indictment; GUILTY of the crime of KIDNAPPING, as contained in Counts 3 and 4 of the Indictment; and GUILTY of the crime of ABUSE OF A CORPSE, as contained in Count 6 of the Indictment, which offenses occurred on or about November 6, 2001.

Defendant's sentencing hearing was held pursuant to O.R.C. 2929.19. The Defendant was afforded all rights pursuant to Crim R. 32. The Court has considered the record, oral statements, as well as the principles and purposes of sentencing under O.R.C. 2929.11, and the seriousness and recidivism factors under O.R.C. 2929.12.

Thereupon, the Court inquired of the said Defendant if he had anything to say why judgment should not be pronounced against him; and having nothing but what he had already said, and showing no good and sufficient cause why judgment should not be pronounced:

The Court further finds the following pursuant to O.R.C. 2929.13(B):

(1)   prior felony convictions;

(2)   extensive misdemeanor record;

(3)   on post-release control at the time of the offense;

(4)   likely to re-offend;

(5)   does not show proper remorse;

(6)   failure to impose a prison sentence would demean the seriousness of the Defendant's conduct;

(7)   A prison sentence is required to adequately protect the public from future crime by the Defendant; AND

The Court further finds the Defendant is not amenable to community control and that prison is consistent with the purposes of O.R.C. 2929.11.

IT IS THEREFORE ORDERED AND ADJUDGED BY THIS COURT that the Defendant, MARK A. BARCLAY, be committed to the Ohio Department of Rehabilitation and Corrections at Grafton, Ohio, for a definite term of Fifteen (15) Years to LIFE, which is a mandatory term pursuant to O.R.C. 2929.13(F), 2929.14(D)(3), or 2925.01, for punishment of the crime of AGGRAVATED MURDER, Ohio Revised Code Section 2903.01(A), a special felony; for a definite term of Eight (8) Years on each of two counts, which are not mandatory terms pursuant to O.R.C. 2929.13(F), 2929.14(D)(3), or 2925.01, for punishment of the crime of KIDNAPPING, Ohio Revised Code Section 2905.01(A)(3), felonies of the first (1st)

COPY

COPY

COMMON PLEAS COURT
COUNTY OF SUMMIT

JOURNAL ENTRY

THE STATE OF OHIO

vs.

Journal No.

Page

Entered _____ , 20 ____

Hon. _____ Judge Presiding

degree; and for a definite term of Ten (10) Months, which is not a mandatory term pursuant to O.R.C. 2929.13(F), 2929.14(D)(3), or 2925.01, for punishment of the crime of ABUSE OF A CORPSE, Ohio Revised Code Section 2927.01, a felony of the fifth (5th) degree, and that the said Defendant pay the costs of this prosecution for which execution is hereby awarded; said monies to be paid to the Summit County Clerk of Courts, County Safety Building, 53 University Avenue, Akron, Ohio 44308-1662.

The Court further finds, pursuant to O.R.C. 2929.14(E)(3), that consecutive sentences are necessary to protect the public and punish the offender, not disproportionate to the conduct and to the danger the offender poses; the crimes were committed while under post-release control; the harm was so great or unusual that single term does not adequately reflect the seriousness of the conduct; and consecutive terms are needed to protect the public.

IT IS FURTHER ORDERED that the sentence imposed in Counts 2, 3, and 4 be served CONCURRENTLY and not consecutively with each other, but CONSECUTIVELY with Count 1.

IT IS FURTHER ORDERED, pursuant to the above sentence, that the Defendant be conveyed to the Lorain Correctional Institution at Grafton, Ohio, to commence the prison intake procedure.

After release from prison, the Defendant is ordered subject to post-release control to the extent the parole board may determine as provided by law. Defendant is ORDERED to pay all prosecution costs.

IT IS FURTHER ORDERED that the Defendant be given credit for 345 days served in the Summit County Jail as of the date of sentencing, October 24, 2002, as agreed to by all parties, to be applied to Count 1.

Thereupon, the Court informed the Defendant of his right to appeal pursuant to Rule 32A2, Criminal Rules of Procedure, Ohio Supreme Court, and further the Court appoints Attorney NICK SWYRYDENKO as counsel to represent the said Defendant for purposes of appeal due to said Defendant's indigency.

APPROVED:
October 24, 2002
pmw15

TED SCHNEIDERMAN, Judge
Court of Common Pleas
Summit County, Ohio

cc:    Prosecutor Mike Carroll
       Criminal Assignment
       Attorney Kerry O'Brien
       Attorney Annalisa Williams
       Booking
       Court Convey
       Summit County Sheriff's Office
       Kris Gowens, Court Reporter, 2nd Floor

certify this to be a true copy of the original.
Diana Zalaski, Clerk of Courts

Deputy

③

COPY

COPY

## IN THE COURT OF COMMON PLEAS
## COUNTY OF SUMMIT

DIANA ZALESKI

2002 OCT 28  PM 12: 54

SUMMIT COUNTY
CLERK OF COURTS

SEPTEMBER                                                    02
_____ Term 20 _____

THE STATE OF OHIO

vs.

MARK A. BARCLAY

No.        CR 02 02 0305 (C)

**JOURNAL ENTRY**

THIS DAY, to-wit: The 25th day of October, A.D., 2002, upon due consideration of this Court, IT IS HEREBY ORDERED that the Journal Entry dated October 24, 2002 be amended to read in part as follows:

"THIS DAY, to-wit: The 24th day of October, A.D., 2002, now comes the Prosecuting Attorney on behalf of the State of Ohio, the Defendant, MARK A. BARCLAY, being in Court with counsel, KERRY O'BRIEN and ANNALISA WILLIAMS, for trial herein.

**Prior to the trial and upon Motion of the Prosecuting Attorney on behalf of the State of Ohio, the Court hereby amends Count 1 of the Indictment to the lesser and included offense of MURDER, a felony of the first (1st) degree, by deleting reference to prior calculation and design.**

Heretofore on October 15, 2002, a Jury was duly empanelled and sworn, and the trial commenced and not being completed, adjourned and reconvened on October 17, 18, and 21, 2002, and concluded on October 22, 2002, at which time the Jury having heard the testimony adduced by both parties hereto, the arguments of counsel and the charge of the Court, retired to their room for deliberation.

And thereafter, to-wit: On October 24, 2002 at 9:25 A.M., said Jury came again into the Court and returned their verdict in writing finding said Defendant GUILTY of the crime of **MURDER**, as contained in **the amended** Count 1 of the Indictment; GUILTY of the crime of KIDNAPPING, as contained in Counts 3 and 4 of the Indictment; and GUILTY of the crime of ABUSE OF A CORPSE, as contained in Count 6 of the Indictment, which offenses occurred on or about November 6, 2001.

Defendant's sentencing hearing was held pursuant to O.R.C. 2929.19. The Defendant was afforded all rights pursuant to Crim R. 32. The Court has considered the record, oral statements, as well as the principles and purposes of sentencing under O.R.C. 2929.11, and the seriousness and recidivism factors under O.R.C. 2929.12.

Thereupon, the Court inquired of the said Defendant if he had anything to say why judgment should not be pronounced against him; and having nothing but what he had already said, and showing no good and sufficient cause why judgment should not be pronounced:

The Court further finds the following pursuant to O.R.C. 2929.13(B):

(1) prior felony convictions;

(2) extensive misdemeanor record;

(3) on post-release control at the time of the offense;

(4) likely to re-offend;

(5) does not show proper remorse;

(6) failure to impose a prison sentence would demean the seriousness of the Defendant's conduct;

(7) A prison sentence is required to adequately protect the public from future crime by the Defendant; AND

The Court further finds the Defendant is not amenable to community control and that prison is consistent with the purposes of O.R.C. 2929.11.

(4)

OPY

COPY

*10*

COMMON PLEAS COURT
COUNTY OF SUMMIT

JOURNAL ENTRY

THE STATE OF OHIO

vs.

Journal _____ No. _____ Page _____

Entered _____, 20__

Hon. _____
Judge Presiding

IT IS THEREFORE ORDERED AND ADJUDGED BY THIS COURT that the Defendant, MARK A. BARCLAY, be committed to the Ohio Department of Rehabilitation and Corrections at Grafton, Ohio, for a definite term of Fifteen (15) Years to LIFE, which is a mandatory term pursuant to O.R.C. 2929.13(F), 2929.14(D)(3), or 2925.01, for punishment of the crime of **MURDER**, Ohio Revised Code Section **2903.02, a felony of the first (1st) degree . . ."**

APPROVED:
October 25, 2002
pmw16

TED SCHNEIDERMAN, Judge
Court of Common Pleas
Summit County, Ohio

cc:     Prosecutor Mike Carroll
        Criminal Assignment
        Attorney Kerry O'Brien
        Attorney Annalisa Williams
        Booking
        Court Convey
        Summit County Sheriff's Office
        Kris Gowens, Court Reporter, 2nd Floor



OFY .
COPY

IN THE COURT OF COMMON PLEAS
COUNTY OF SUMMIT

SEPTEMBER _____ Term 20 _____ 02

THE STATE OF OHIO )
                        )
        vs.       )
                        )
MARK A. BARCLAY    )

No.    CR 02 02 0305 (C)

**JOURNAL ENTRY**

THIS DAY, to-wit: The 4th day of November, A.D., 2002, upon due consideration of this Court, IT IS HEREBY ORDERED that the Journal Entry dated October 24, 2002 and filed October 25, 2002, be amended to read in part as follows:

"IT IS FURTHER ORDERED that the sentence imposed in Counts 3, 4, and **6** be served CONCURRENTLY and not consecutively with each other, but CONSECUTIVELY with Count 1."

APPROVED:
November 4, 2002
pmw17

TED SCHNEIDERMAN, Judge
Court of Common Pleas
Summit County, Ohio

cc:   Prosecutor Mike Carroll
       Criminal Assignment
       Attorney Kerry O'Brien
       Attorney Annalisa Williams
       Booking
       Convey
       SCSO
       Kris Gowens, Court Reporter, 2nd Floor

DIANA ZALESKI
2002 NOV -5 AM 11: 25
SUMMIT COUNTY
CLERK OF COURTS

⑥

not allied offenses of similar import: State v. Hamilton, No. 474 (4th Dist.), 1990 Ohio App. LEXIS 3849.

**18.** (1990) Attempted escape is not an offense in itself under RC § 2923.02. Instead it is encompassed under RC § 2921.34: State v. Nero, No. 1392 (4th Dist.), 1990 Ohio App. LEXIS 1383.

**19.** (1989) The omission of the words "prior calculation and design" from the list of culpable mental states in RC § 2923.02(A), defining "attempt," does not preclude the prosecution of an accused for attempted aggravated murder under RC § 2903.01(A): State v. Dupice, 57 OApp3d 99, 566 NE2d 1261.

**20.** (1988) The Ohio Legislature did not eliminate the common-law defense of legal impossibility in enacting RC § 2923.02(B), the Ohio attempt statute: State v. Collins, 54 OApp3d 134, 561 NE2d 954.

**21.** (1981) Attempted theft by threat, as defined in RC §§ 2913.02(A)(4) and 2923.02(A), may be a lesser included offense of robbery as defined in RC § 2911.02(A) since (1) it is a crime of a lesser degree than robbery; (2) the greater offense of robbery cannot be committed without attempted theft by threat also having been committed; and (3) attempted theft by threat consists entirely of some, but not all, the elements of robbery: State v. Gates, 2 OApp3d 485, 2 OBR 611, 442 NE2d 1321.

**22.** (1976) In a prosecution for theft, where the defendant raises both the complete defense of lack of intent and the partial defense of failure to exert control over the allegedly stolen property, the court should charge the jury on both theft and attempted theft, since acceptance of the partial defense is compatible with a conviction of attempted theft: State v. Fann, 2 OO3d 87 (App).

**23.** (1983) Renunciation of criminal purpose is not voluntary if it is motivated, in whole or in part, by circumstances, not present or apparent at the inception of the actor's course of conduct, which increase the probability of detection or apprehension or which make more difficult the accomplishment of the criminal purpose: State v. Arnold, 9 OMisc2d 14, 9 OBR 434, 459 NE2d 631 (MC).

**24.** (1979) An offense of soliciting under RC § 2907.24 necessarily constitutes an attempt to commit an offense of prostitution under RC § 2907.25, and therefore there can be no such offense as attempted soliciting under the general attempt statute, RC § 2923.02: State v. Anderson, 62 OMisc 1, 16 OO3d 185, 404 NE2d 176 (MC).

## [§ 2923.02.1] § 2923.021 Repealed, 134 v H 511, § 2 [125 v S 62(125)]. Eff 1-1-74.

This section concerned sale or possession of switch or spring knife.

## § 2923.03 Complicity.

(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

(1) Solicit or procure another to commit the offense;
(2) Aid or abet another in committing the offense;
(3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;
(4) Cause an innocent or irresponsible person to commit the offense.

(B) It is no defense to a charge under this section that no person with whom the accused was in complicity has been convicted as a principal offender.

(C) No person shall be convicted of complicity under this section unless an offense is actually committed, but a person may be convicted of complicity in an attempt to commit an offense in violation of section 2923.02 of the Revised Code.

(D) If an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense, the court, when it charges the jury, shall state substantially the following:

"The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.

It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth."

(E) It is an affirmative defense to a charge under this section that, prior to the commission of or attempt to commit the offense, the actor terminated his complicity, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose.

(F) Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense.

**HISTORY:** 134 v H 511 (Eff 1-1-74); 141 v H 338. Eff 9-17-86.

Not analogous to former RC § 2923.03 (GC § 12819-3; 115 v 189; Bureau of Code Revision, 10-1-53; 129 v 420), repealed 134 v H 511, § 2, eff 1-1-74.

### 1974 Committee Comment to H 511

In essence, this section codifies existing case law with respect to "aiding and abetting." Under the section, an accomplice is one who solicits, procures, or conspires with another to commit an offense, aids or abets its commission, or causes an innocent or irresponsible person to commit the offense.

It is unnecessary that the principal offender be convicted before an accomplice can be convicted. An offense must actually be committed, however, before a person may be convicted as an accomplice. The single exception to this rule permits conviction as an accomplice in an attempt to commit an offense. A person accused of complicity may defend on the ground that prior to an attempt or the commission of the offense, he quit his part in it, under circumstances showing that he completely and voluntarily gave up his criminal purpose.

Accomplices are liable to prosecution and punishment as principal offenders. For example, an accomplice to aggravated murder is liable to the death penalty the same as the actual murderer.

In charging complicity, the accused may be charged specifically as an accomplice under this section, or he may be charged simply as a joint offender in the offense committed.

**Cross-References to Re**
Affirmative defense, RC §
Aider or abettor not to be
Culpable mental states, R

**Comparative Legislatio**
Complicity
18 USC § 2
CA—Penal Code § 653
FL—Stat Ann § 777.03
IL—Comp Stat Ann ch
IN—Code § 35-41-2-4
KY—Rev Stat Ann §§ 5
MI—Comp Laws Ann §
NY—Penal Law § 20.00
PA—CSA tit 18 § 903

**Text Discussion**
Required jury instructions.

**Forms**
Complicity. 4 OJI 523.03
Testimony of accomplice.

**Research Aids**
Corroboration:
O-Jur3d: Crim L §§ 27
Am-Jur2d: Consp §§ 3
C.J.S.: Crim L §§ 655,
Participation in or procure
O-Jur3d: Crim L §§ 6?
Am-Jur2d: Consp §§ 7
West Key No. Reference
Crim Law 510 et seq, 5

**ALR**
Acquittal of principal, or
offense, as affecting
and abettor 9 ALR4
Conspiracy to induce brea
Criminal liability of perso
participant, for assau
or improper punishm
teacher, or one in loc
Criminal responsibility, as
than driver at time of
ute. 62 ALR2d 1130.
Criminal responsibility of
of a kind ordinarily
knowledge that it is
purposes 108 ALR3
Necessity of alleging speci
as accessory before t
Necessity of, and prejudi
instruction to jury as
defendant in federal
Offense of aiding and abe
narcotics, 47 ALR3d
Propriety of specific jury in
plices. 4 ALR3d 351
Prosecutrix in incest case a
705.
Receiver of stolen goods a
of corroboration. 74 A
Right of criminal defendan
on having deals with
ALR5th 39.
Statute protecting minors



[Cite as *State v. Barclay*, 2003-Ohio-5468.]

STATE OF OHIO )            IN THE COURT OF APPEALS
                       )ss:       NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT )

STATE OF OHIO

    Appellee

    v.

MARK A. BARCLAY

    Appellant
C .A. No.    21336

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR 02-02-0305(C)

## DECISION AND JOURNAL ENTRY

Dated: October 15, 2003

    This cause was heard upon the record in the trial court.  Each error assigned

has been reviewed and the following disposition is made:

---

    BATCHELDER, Judge.

2

{¶1}  Appellant, Mark A. Barclay, appeals from his convictions in the Summit County Court of Common Pleas for murder, kidnapping, and abuse of a corpse. We affirm.

I.

{¶2}  On February 12, 2002, the Summit County Grand Jury indicted Mr. Barclay on four separate counts: (1) one count of aggravated murder, in violation of R.C. 2903.01(A); (2) two counts of kidnapping, in violation of R.C. 2905.01(A)(3); and (3) one count of abuse of a corpse, in violation of R.C. 2927.01(B).  Thereafter, the State moved to amend the indictment, and the trial court granted the motion.  Accordingly, the aggravated murder charge, as contained in the original indictment, was reduced to the lesser and included offense of murder.  A jury trial followed.  The jury returned a verdict of guilty on all counts, and the trial court sentenced Mr. Barclay accordingly.  Mr. Barclay timely appeals and raises one assignment of error for review.

II.

### Assignment of Error

"[MR. BARCLAY'S] CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶3}  In his sole assignment of error, Mr. Barclay challenges the adequacy of the evidence presented at trial.  Specifically, Mr. Barclay avers that his convictions for murder, kidnapping, and abuse of a corpse were contrary to the manifest weight of the evidence.  We disagree.

{¶4} "[A] manifest weight challenge questions whether the state has met its burden of persuasion." *State v. Gulley* (Mar. 15, 2000), 9th Dist. No. 19600, citing *State v. Thompkins* (1997), 78 Ohio St.3d 380, 390 (Cook, J., concurring). When a defendant asserts that his conviction is against the manifest weight of the evidence,

> "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten* (1986), 33 Ohio App.3d 339, 340.

{¶5} This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id. Furthermore, the evaluation of the weight to be given to the evidence and evaluation of the credibility of the witnesses are functions primarily reserved for the trier of fact. *State v. Gilliam* (Aug. 12, 1998), 9th Dist. No. 97CA006757.

{¶6} Mr. Barclay was found guilty of murder, in violation of R.C. 2903.02(A), which provides, "[n]o person shall purposely cause the death of another[.]" The jury also found Mr. Barclay guilty of kidnapping, in violation of R.C. 2905.01(A)(3). R.C. 2905.01(A)(3) states, in relevant part, "[n]o person, by force, threat, or deception *** shall remove another from the place where the other person is found or restrain the liberty of the other person *** [t]o terrorize, or to inflict serious physical harm on the victim or another[.]" Finally, Mr. Barclay was

4

found guilty of abuse of a corpse, in violation of R.C. 2927.01(B). This section provides that "[n]o person, except as authorized by law, shall treat a human corpse in a way that would outrage reasonable community sensibilities." R.C. 2927.01(B).

{¶7}  At trial, Robert Smarr ("Smarr") testified that he discovered a man's body in a drainage ditch under an I-76 overpass on November 17, 2001. He explained that he discovered the body because a man's leg stuck out from under a board covering the drainage ditch. Smarr further testified that he immediately notified the authorities of his discovery.

{¶8}  Officer Eric Wells testified that he received a dispatch concerning the discovery of a body. He stated that when he arrived at the crime scene he saw a board covering the drainage ditch, and the board was "shoved off just a little[,]" thereby exposing a man's foot and leg. Officer Wells further testified that he moved the board and observed a body that had been wrapped and bound in sheets.

{¶9}  Detective William Laughlin testified that he learned that four individuals discovered a body in a drainage ditch. He described the dimensions of the drainage ditch as 5'5" by 5'5" and 3' deep. Detective Laughlin additionally stated that the drainage ditch was filled halfway with debris.

{¶10}  Detective Laughlin testified that he spoke with numerous individuals during the course of his investigation, including Denni Payne ("Payne"), Kimberly Martin ("Martin"), Robert Greathouse ("Greathouse"), and Jennifer Wohlford ("Wohlford"). After speaking with Payne, Detective Laughlin explained that he

learned that the incident took place at 703 Thayer Avenue, which was Payne's residence. He also testified that Payne informed him that Mr. Barclay, Martin, Greathouse, Wohlford, and Maynard Nettle ("Nettle") were involved in the incident.

{¶11} Detective Laughlin asserted that Martin told him that the incident took place on the day she went to the Bureau of Motor Vehicles ("BMV") to renew her driver's license. He then asserted that Martin, Greathouse, and Wohlford named the same individuals as participants in the crime; specifically, those named included Mr. Barclay, Martin, Greathouse, Wohlford, Nettle, and Payne. Finally, Detective Laughlin conceded that he did not have any physical or scientific evidence linking Mr. Barclay to the murder.

{¶12} Kathy Pritchard ("Pritchard") testified that she works at the BMV as a supervisor. She asserted that Martin came in to the BMV on November 6, 2001.

{¶13} The testimony of Wohlford, Payne, Martin, Greathouse, and Nettle revealed that on November 6, 2001 Mitchell Strodes ("Strodes"), the victim, arrived at 703 Thayer Avenue and asked Martin if she had any work that he could do for her. Martin told Strodes he could transport her belongings from her car to the trunk of Payne's car and rake the leaves. Thereafter, Martin, Greathouse, and Nettle proceeded to the BMV.

{¶14} When they returned from the BMV, Martin asked Greathouse and Nettle to retrieve a radio that Strodes allegedly placed in the trunk of Payne's car. Wohlford testified that Greathouse and Nettle returned from the garage, and

Greathouse said, "[t]here ain't nothing in the trunk of that car." Wohlford further stated that Mr. Barclay was made aware of the situation, and Mr. Barclay said to Martin, "[l]et me go find him for you. I will go find him for you. I will bring him back here. I will take care of him for you." Martin added that Mr. Barclay angrily stated numerous times, "I am going to kill that mother fucker for ripping you off."

{¶15} Subsequently, Strodes returned to 703 Thayer Avenue and entered the residence. While inside, Martin accused Strodes of stealing her belongings, and began hitting him on the head with an ASP baton. Mr. Barclay held Strodes' arms behind his back during Martin's assault. Mr. Barclay also began hitting and kicking Strodes.

{¶16} During the "beating," Mr. Barclay attempted to "tie *** up" Strodes with wire cable; however, he was unsuccessful and he became flustered. As a result, he asked if anyone had a gun and said, "if he had a gun he would just finish the job and it would be over with." Mr. Barclay then tied Strodes up in a sheet and instructed the others to stand on Strodes in an attempt to knock him unconscious.

{¶17} Mr. Barclay, Nettle, and Payne discussed what they should do with Strodes. Following their discussion, Mr. Barclay and Nettle carried Strodes outside and placed him in the trunk of Payne's car. Nettle drove Payne's car as Mr. Barclay gave him instructions. While en route, Nettle heard noises and realized Strodes was alive. Mr. Barclay then told Nettle to pull over onto a gravel road underneath an overpass. Nettle stated he saw Mr. Barclay hitting Strodes with a jack stand, and heard Mr. Barclay say "[w]e don't have to worry about that,

he is dead now." Nettle then explained that Mr. Barclay threw Strodes on the ground and put him in "some sort of culvert or a hole[,]" and asked Nettle to "[h]elp [him] cover [Strodes] up."

{¶18} Dr. Lisa Kohler, the chief medical examiner for Summit County, testified as to the injuries Strodes sustained in the assault. In particular, Dr. Kohler described his injuries as a fractured jaw; numerous abrasions on the scalp, chest, abdomen, arms, hips, thighs, and calves; multiple bruises on the scalp, ribs, and wrist; and trauma to the brain. Although Dr. Kohler could not testify as to what instrument caused Strodes' injuries, she testified that the cause of death was "multiple blunt injuries to the head due to being beaten by an assailant [or] *** assailants[,]" and that the manner of death was homicide.

{¶19} Following the State's witnesses, the defense presented its evidence and witnesses. Sandra Vinson Sanders ("Sanders") testified that she met Martin in the Summit County Jail and spoke to her regarding her case. Sanders stated that Martin told her that she controlled the men in the case and that Mr. Barclay was not involved in the murder. Sanders further commented that Martin did not show any remorse for her actions.

{¶20} Detective Juanita Elton testified that she interviewed Norman Barnes ("Barnes") concerning the homicide. She stated that Barnes named five individuals that may have been involved in the homicide, but that he did not name Mr. Barclay. Detective Elton noted that Barnes obtained the names of the five individuals from Patrick Goodman ("Goodman").

{¶21} Goodman testified that he has never seen Mr. Barclay act violently; however, he has seen Martin, Payne, Greathouse, and Nettle act violently. He did acknowledge that he and Mr. Barclay are friends.

{¶22} Goodman stated that he was at 703 Thayer Avenue on November 6, 2001, and watched Strodes transport Martin's belongings and rake the leaves. He explained that Martin paid him to watch Strodes. He further stated that Martin later told him that she had killed Strodes and named the other individuals involved; Martin did not mention Mr. Barclay. Goodman then testified that Wohlford informed him of those involved in the incident, and she, too, did not name Mr. Barclay. Finally, Goodman asserted that he watched a videotape of the murder and did not see Mr. Barclay on the videotape. He admitted that he had denied knowledge of the videotape to the police officers. He further acknowledged that he did not disclose to anyone his presence at 703 Thayer Avenue on November 6, 2001.

{¶23} In response to the defense witnesses, the State called Sergeant Ray Youngkin. Sergeant Youngkin testified that he spoke with Barnes, and, based on this conversation, he began to look for the videotape. He explained that a search warrant was procured for 703 Thayer Avenue. Sergeant Youngkin asserted that the search of 703 Thayer Avenue did not uncover a videotape, a camcorder, a video recorder, or anything of that nature.

{¶24} After careful review of the record, we are unable to conclude that the trier of fact lost its way and created a manifest miscarriage of justice when

convicting Mr. Barclay of murder, kidnapping, and abuse of a corpse. Although conflicting testimony was presented, we refrain from overturning the verdict because the jury chose to believe other testimony. "[W]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the [trier of fact] believed the prosecution testimony." *Gilliam*, supra. Consequently, Mr. Barclay's convictions were not against the manifest weight of the evidence. Accordingly, Mr. Barclay's sole assignment of error is overruled.

### III.

{¶25} Mr. Barclay's assignment of error is overruled. The convictions in the Summit County Court of Common Pleas are affirmed.

Judgment affirmed.

WILLIAM G. BATCHELDER
FOR THE COURT

SLABY, P. J.
WHITMORE, J.
CONCUR

APPEARANCES:

NICHOLAS SWYRYDENKO, Attorney at Law, Suite 105, 1000 S. Cleveland-Massillon Rd., Akron, Ohio 44333, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney and ANDREA H. PARK, Assistant Prosecuting Attorney, Summit County Safety Building, 53 University Avenue, 6th Floor, Akron, Ohio 44308, for Appellee.

IN THE SUPREME COURT OF OHIO

STATE OF OHIO,

        Plaintiff-Appellee     :   Case No._____

   vs.                        :

MARK A. BARCLAY,         :

        Defendant-Appellant   :   [EX PARTE]

**DEFENDANT-APPELLANT'S MOTION FOR LEAVE TO WAIVE STRICT COMPLIANCE BY RULE AND TO ALLOW HIM TO FILE A REDUCED NUMBER OF HIS MEMORANDUM IN SUPPORT OF JURISDICTION.**

Now comes Defendant-Appellant, Mark A. Barclay, and respectfully requests that he be allowed to file a reduced number of the twelve (12) required copies of his memorandum in support of jurisdiction. Defendant-Appellant states he is an indigent state prisoner who lacks sufficient funds and resources to provide as reuired by Rule all twelve (12) required copies. Defendant-Appellant submits he is able to provide one (1) complete copy of his memorandum in support of jurisdiction and he has submitted for filing in conjunction with his notice of appeal, an affidavit of indigency attesting to his poverty and indigent status.

It is so prayed.

                          Respectfully Submitted

                          *Mark A. Barclay*
                          MARK A. BARCLAY #434816 PRO SE
                          Mansfield Correctional Institution
                          P.O. Box 788
                          Mansfield, Ohio 44901

ORIGINAL



# IN THE SUPREME COURT OF OHIO
## Supreme Court Case Number 03-2072

**STATE OF OHIO**

     Appellee

     v.

**MARK A. BARCLAY**

     Appellant

On Appeal from the Summit
County Court of Appeals,
Ninth Appellate District
Court of Appeals No. 21336

---

## MEMORANDUM IN OPPOSITION
## STATE OF OHIO

---

**SHERRI BEVAN WALSH**
Prosecuting Attorney

**PHILIP D. BOGDANOFF #0018887** (Counsel of Record)
Assistant Prosecuting Attorney
Appellate Division
Summit County Safety Building
53 University Avenue
Akron, OH 44308
(330) 643-2791

Counsel for Appellee


**MARK A. BARCLAY**
#434-816
Mansfield Correctional Institution
P.O. Box 788
Mansfield, OH 44901

Appellant, *Pro Se*

DEC 2 9 2005

EXHIBIT
14

## TABLE OF CONTENTS

**PAGE(S)**

Proposition of Law I:

      An Appellate Court Will Affirm A Conviction That
      Is Supported By The Evidence ............................................. 1

Why Leave to Appeal Should Be Denied ...................................................... 8

Proof of Service ............................................................................................ 9

**Appendix**                                                  **Appx. Page**

**Unreported Cases**

*State v. Tyler*
      (Feb. 27, 2002), Summit App. No. 20679 .......................................... A-1

## PROPOSITION OF LAW I

### AN APPELLATE COURT WILL AFFIRM A CONVICTION THAT IS SUPPORTED BY THE EVIDENCE.

### LAW AND ARGUMENT

The appellant contends that his convictions for Murder, Kidnapping, and Abuse of a Corpse was against the manifest weight of the evidence. The appellate court will only reverse a conviction based upon the manifest weight of the evidence in the exceptional case where the jury has clearly lost its way and created a manifest weight of justice:

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, considering the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten* (1986), 33 Ohio App.3d 339, 340.

In applying this test, the court must defer to the conclusions of the trier of fact in its determination of the appropriate amount of weight to be given of the evidence and in determining the credibility of the witness. *State v. DeHass* (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. Conflicting evidence alone does not deem a conviction to be contrary to the manifest weight of the evidence. *State v. Tyler* (Feb. 27, 2002), Summit App. No. 20679.

The Appellant's convictions for Murder, Kidnapping, and Abuse of a Corpse are not against the manifest of weight of the evidence and are supported by sufficient evidence. The Appellant was convicted under R.C. 2903.02(A), Murder, which provides:

> (A) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy.

1

Purposely is defined under R.C. 2901.22(A) as:

> (A) A person acts purposely when it is his specific intention to cause a certain result ***

Martin testified that when she told the Appellant that she got "ripped off" by Strodes, the Appellant became visibly upset. Martin stated that the Appellant became so angry he told her, repeating several times, that he was going to "kill (Strodes) that mother fucker." (T.p. 292). Appellant fulfilled his intentions. When Strodes arrived at 703 Thayer, Martin started to strike Strodes repeatedly in the head while the Appellant held Strodes' arms. (T.pp. 211-212). When Strodes fell to the ground, the Appellant kicked and hit Strodes repeatedly. (T.pp. 214, 308). Even as Strodes attempted to get up, the Appellant attempted to put Strodes into a chokehold and resumed beating Strodes. (T.p. 294). The Appellant attempted to tie Strodes up with wire cable, but was unable to do so, thus prompting to request for a gun. (T.p. 216). Greathouse stated that the Appellate said, "if he had a gun he would just finish the job and it would be over with." (T.p. 378). When no one responded to his request, he instructed his co-defendants to stand on Strodes' back in an attempt to suffocate him. (T.pp. 218-219).

It is clear through the Appellant's statements and actions that his purpose was to kill Mitchell Strodes. After the suffocation attempt, that was not the end of Strodes' abuse. The Appellate then wrapped Strodes up in a sheet and along with Nettle placed, Strodes' body in the trunk of Payne's car. (T.pp. 218, 220). The murder of Mitchell Strodes was complete when the Appellant repeatedly struck Strodes while he was in the trunk of the car with a jack stand. After Strodes was killed, the Appellant told Nettle that "we won't have to worry about that, he is dead now." (T.pp. 417-418). Therefore the testimony supports the contention that the Appellant's conviction for Murder was not against the manifest weight of evidence.

2

The Appellant was also convicted of two (2) counts of Kidnapping. Under R.C. 2905.01(A)(3), Kidnapping, provides that:

> (A)    No person by force, threat, or deception *** shall remove another from the place where the other person is found or restrain the liberty of the other person for any of the following purposes:
>
> * * *
>
> (3) To terrorize, or to inflict serious physical harm on the victim
>
> * * *

Force is defined in R.C. 2901.01(A)(1) as:

> (1) Any violence, compulsion, or constrain physically exerted by any means upon or against a person or thing.

Physical harm to persons is defined in R.C. 2901.01(A)(3) to be:

> (3) Any injury, illness, or other physiological impairment, regardless of its gravity or duration.

Serious physical harm is defined in R.C. 2901.01(A)(5)(b) as:

> (b) Any physical harm that carries a substantial risk of death.

Substantial risk is defined in R.C. 2901.01(A)(8):

> (8) A strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist.

The first count of Kidnapping refers to the victim's liberty that was restrained. R.C. 2905.01(A).   The victim attempted many times to leave 703 Thayer.   While the co-defendants and the Appellant beat him repeatedly, he persisted and attempted to get up off the ground, but to no avail, as he was kicked back to the ground. (T.p. 294). At one point, several persons including the Appellant stood on Strodes. (T.pp. 218-219). Not only was force used to restrain Strodes' liberty, he suffered brain injury and serious bodily harm as abrasions and

bruises were evident all over his body, in addition to a fractured jaw. (T.pp. 562-566). Therefore, the evidence fully supports the finding for a conviction under the first count of Kidnapping. Therefore the conviction was not a manifest injustice.

The second count of Kidnapping pertains to the victim being "removed from the place he was found." R.C. 2905.01(A). The Appellant and Nettle moved Strodes' wrapped body from 703 Thayer to Payne's car and drove to a gravel road where they buried the body in a culvert. It is apparent through the Appellant's actions that his intent was to terrorize and inflict serious physical harm. This was shown when Strodes was placed into Payne's car, struck several times with a tire jack, and then deposited the body into a culvert. (T.pp. 417-418). These events in sum manifest the Appellant's intent to inflict serious bodily harm. Therefore, the second conviction for Kidnapping is not against the manifest weight of the evidence.

The Appellant's fourth conviction was for Abuse of a Corpse. R.C. 2927.01(B) provides that:

> (B) No person *** shall treat a human corpse by a way that would outrage reasonable community sensibilities.

The Appellant's action did arise to abusing a corpse. After Strodes was dead, Nettle and the Appellant placed Strodes in a ditch and covered him up with building material. (T.pp. 417-418). This action would outrage the community. Not only was the victim terrorized and abused before his body was dumped off, but his body was left as remains for nature to attack. When his body was found partially decomposed, it was embedded with maggots and other insect activity. (T.p. 560). Thus, the Appellant's conviction for abuse of corpse is not against the manifest weight of the evidence.

The Appellant contends that Jury lost its way and created a manifest injustice by relying on the testimony of his accomplices, disregarding evidence that the Appellant was not present at

4

703 Thayer on November 6, 2001, and that he was no way involved with the torture and death of Mitchell Strodes. In reviewing the Appellant's first witness, Sandra Vinson Sanders, her testimony was that Martin told her that the Appellant had nothing to do with the murder he was charged with. (T.p. 534). She also stated that she was not at Thayer Street on November 6, 2001 and that she did not know what happened there that day. (T.p. 544). Her knowledge of the events of November 6 was based on information she learned from Martin. Sanders had no personal knowledge of her own on what transpired on November 6, 2001. It was also shown to the jury at trial that Sanders had an extensive 25-26 year criminal history. (T.p. 537). She admitted to having eight (8) convictions for Forgery, three (3) convictions for Uttering, three (3) convictions for Receiving Stolen Property, one (1) conviction for Grand Theft, two (2) convictions for misdemeanor thefts, two (2) convictions for Possession of Drugs, and Involuntary Manslaughter. (T.pp. 539-542). As most of Sander's convictions involved crimes of dishonesty, the jury acted appropriately if it concluded to ignore Sander's testimony or question her credibility. Moreover, due to the lack of personal knowledge of the events surrounding Strodes' death, the jury would not have been outside its discretion to limit the amount of weight given to Sander's testimony.

Patrick Goodman was the Appellant's other witness. He testified to seeing Strodes clean Martin's car and rake the leaves, but could not recall what day. (T.pp. 617, 621). At trial Goodman was shown to have told police during the first interview that Martin told him that herself, Rob, Doug, Denni, James and a black male did the murder. (T.p. 648). He told the police that he could not remember the black guy's name. He told them that he recognized the Appellant's picture of someone being at the Thayer house, but he was not certain if Martin mentioned the Appellant's name as the one involved with Strodes' murder.

5

He however admitted to viewing a videotape of the beating and Murder of Strodes, despite failing to mention the videotape or his presence at the Thayer house on the day that Strodes did yard work when interviewed by the police and prosecutors. He also testified that he did not see the Appellant on the videotape. This information was not disclosed until he spoke with the Appellant's attorney on Friday, October 18, 2001, three days before he testified. (T.p. 647). Goodman also admitted to serving time in prison for Aggravated Robbery and Felonious Assault. (T.p. 644).

Based on the testimony, the jury could have reasonably concluded to minimize the weight to be given to Goodman's testimony. The fact that he could not indicate whether Martin identified the Appellant as the instrument of Strodes' death and his failure to inform police of the videotape of the beating and murder of Strodes all goes to the credibility and veracity of Goodman.

The Appellant's third issue was that the Appellant's co-defendants' testimony was not credible. The State provided the testimony of, Martin, Payne, Greathouse, Nettle, and Wohlford. Each witness confirmed the Appellant's presence at 703 Thayer and that his actions lead to the torture and murder of Strodes. They stated that the Appellant actively struck, kicked, and hit Strodes. (T.pp. 187, 212, 293, 374, 413). All but Wohlford testified that the Appellant led the group in trying to suffocate Strodes, tied Strodes up in sheets and then put Strodes into the trunk of Payne's car to dispose of the body. (T.pp. 218-219, 308, 278, 414). Their testimony should be given considerable weight, as they were present during most or all of the beating of the Strodes. Moreover, except for Wohlford, each co-defendant witness admitted to participating with the Appellant in the beating and death of Strodes. (T.pp. 222, 293, 378, 414).

6

The co-defendants' account of the events of November 6, 2001 was consistent with one another and corroborated the evidence gathered by the Police. The prosecution presented the testimony of Detective Laughlin of the Akron Police. He testified that the sheets the Akron Police found covering Strodes were sheets similar to ones found at Payne's house. (T.p. 73). He also stated that Payne, Martin and Wohlford in their statement to the police all indicated that the Appellant was involved in the homicide of Strodes. (T.pp. 154-155). It was reasonable for the jury to find the Appellant guilty based on the totality of the evidence and the lack of evidence demonstrating reasonably doubt.

Upon reviewing the record, there is no manifest injustice. Thus, the court must defer to the trier of fact and affirm the convictions.

## WHY LEAVE TO APPEAL SHOULD BE DENIED

Pursuant to the argument offered, the Appellee respectfully contends that leave to appeal should be denied, as Appellant has failed to present a substantial constitutional issue, or indicate this case is of great public or general interest.

Respectfully submitted,

**SHERRI BEVAN WALSH**
Prosecuting Attorney

**PHILIP D. BOGDANOFF**
Assistant Prosecuting Attorney
Appellate Division
Summit County Safety Building
53 University Avenue
Akron, OH 44308
(330) 643-2791
Reg. No. 0018887

## PROOF OF SERVICE

I hereby certify that a copy of the foregoing Memorandum in Opposition was sent by regular U.S. Mail to Mark A. Barclay, #434-816, Mansfield Correctional Facility, P.O. Box 788, Mansfield, Ohio, 44901, on the 19th day of December, 2003.

**PHILIP D. BOGDANOFF**
Assistant Prosecuting Attorney
Appellate Division

Citation/Title
2002 WL 274634, State v. Tyler, (Ohio App. 9 Dist. 2002)

**\*274634**      Only the Westlaw citation is currently available.

   CHECK OHIO SUPREME COURT RULES FOR REPORTING OF OPINIONS AND WEIGHT OF LEGAL
AUTHORITY.

              Court of Appeals of Ohio, Ninth District, Summit County.

                            **STATE of Ohio, Appellee,**
                                        **v.**
                         **Leonard B. TYLER, Appellant.**
                                 No. 20679.
                              Feb. 27, 2002.

   Defendant was convicted in the Court of Common Pleas, Summit County, of
aggravated robbery with a firearm specification, carrying a concealed weapon,
and having a weapon under a disability.  Defendant appealed.  The Court of
Appeals, Whitmore, J., held that defendant's conviction of aggravated robbery
was not against manifest weight of the evidence.

   Affirmed.

[1] Criminal Law ☜1159.2(2)
   110 ----
     110XXIV Review
       110XXIV(P) Verdicts
         110k1159 Conclusiveness of Verdict
          110k1159.2 Weight of Evidence in General
   110k1159.2(2) Verdict Unsupported by Evidence or Contrary to Evidence.
   Appellate court that overturns a jury verdict as against the manifest weight
of the evidence acts in effect as a "thirteenth juror," setting aside the
resolution of testimony and evidence as found by the trier of fact.

[2] Criminal Law ☜1159.2(2)
   110 ----
     110XXIV Review
       110XXIV(P) Verdicts
         110k1159 Conclusiveness of Verdict
          110k1159.2 Weight of Evidence in General
   110k1159.2(2) Verdict Unsupported by Evidence or Contrary to Evidence.
   Overturning a jury verdict as against the manifest weight of the evidence is
reserved for the exceptional case where the evidence presented weighs heavily in
favor of the defendant.

[3] Robbery ☜24.15(2)
   342 ----
     342k24 Weight and Sufficiency of Evidence
       342k24.15 Degree or Classification of Offense

       Copyright (c) West Group 2003 No claim to original U.S. Govt. works

2002 WL 274634, State v. Tyler, (Ohio App. 9 Dist. 2002)

    342k24.15(2) First Degree;  Armed Robbery.
    Defendant's conviction of aggravated robbery was not against manifest weight
of evidence that defendant attempted to commit theft offense, despite eyewitness
testimony to effect that no offense had taken place; driver of taxicab in which
defendant had been passenger testified that defendant attempted to rob him at
gunpoint, and relative credibility of eyewitness and victim was for jury to
determine.

[4] Criminal Law ☞1159.4(1)
   110 ----
     110XXIV Review
       110XXIV(P) Verdicts
         110k1159 Conclusiveness of Verdict
           110k1159.4 Credibility of Witnesses
       110k1159.4(1) In General.
    Jury has the opportunity to view witnesses' testimony and adjudge their
credibility; therefore, a reviewing court must give deference to the jurors'
judgments.

    Appeal from Judgment Entered in the Court of Common Pleas, County of Summit,
Ohio, Case No. CR 00 07 1618(B).

    Erin G. Rosen, Attorney at Law, Akron, OH, for appellant.

    Sherri Bevan Walsh, Prosecuting Attorney, and Philip D. Bogdanoff, Assistant
Prosecuting Attorney, Akron, OH, for appellee.

                        DECISION AND JOURNAL ENTRY

    WHITMORE, Judge.

    **1  Appellant Leonard B. Tyler has appealed from a judgment of the Summit
County Court of Common Pleas that found him guilty of aggravated robbery with a
firearm specification, carrying a concealed weapon, and having a weapon under a
disability.  This Court affirms.

                                    I

    Appellant was indicted for one count of aggravated robbery in violation of
R.C. 2911.01(A)(1) with a firearm specification pursuant to R.C. 2941.145, one
count of carrying a concealed weapon in violation of R.C. 2923.12, and one count
of having a weapon under disability in violation of R.C. 2923.13(A)(2).
Following a jury trial, Appellant was found guilty on all counts as well as the
firearm specification, and sentenced by the trial court.  Appellant has timely
appealed, asserting two assignments of error.

                                   II

                       *Assignment of Error Number One*

    Copyright (c) West Group 2003 No claim to original U.S. Govt. works

                                  **A-2**

2002 WL 274634, State v. Tyler, (Ohio App. 9 Dist. 2002)

There is insufficient evidence to support to [sic ] jury's verdict finding Appellant guilty of possession of cocaine.

### Assignment of Error Number Two

The jury's verdict finding Appellant guilty of possession of cocaine is against the manifest weight of the evidence.

In both assignments of error, Appellant has argued that his conviction for aggravated robbery is against both the sufficiency and the manifest weight of the evidence.  (FN1) This Court disagrees.

[1][2] In determining whether a conviction is against the manifest weight of the evidence, this Court must:

> review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

State v. Otten (1986), 33 Ohio App.3d 339, 340, 515 N.E.2d 1009.  An appellate court that overturns a jury verdict as against the manifest weight of the evidence acts in effect as a "thirteenth juror," setting aside the resolution of testimony and evidence as found by the trier of fact.  State v. Thompkins (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541.  This action is reserved for the exceptional case where the evidence presented weighs heavily in favor of the defendant.  Otten, supra.  "A conviction is not against the manifest weight of the evidence merely because there is conflicting evidence before the trier of fact."  State v. Haydon (Dec. 22, 1999), Summit App. No. 19094, unreported, at 14, appeal not allowed (2000), 88 Ohio St.3d 1482, 727 N.E.2d 132, citing State v. Gilliam (Aug. 12, 1998), Lorain App. No. 97CA006757, unreported, at 4. Additionally, it is well established that "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts."  State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.

R.C. 2911.01(A) provides:

No person in attempting or committing a theft offense, as defined in [R.C. 2913.01], or in fleeing immediately after the attempt or offense, shall[:]

**2  (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]

Appellant has argued that no rational trier of fact could have found Appellant guilty beyond a reasonable doubt of the element of attempting to commit a theft offense.

Copyright (c) West Group 2003 No claim to original U.S. Govt. works

2002 WL 274634, State v. Tyler, (Ohio App. 9 Dist. 2002)

[3] The evidence adduced at trial showed that on the evening of July 23, 2000, City Yellow Cab driver Joseph Foster was dispatched to pick up a passenger at Crosier Street. When Foster arrived, he picked up Appellant. Appellant told Foster that he wanted to go to Glenn Street, but did not specify an address for his destination.

Foster testified that after he had picked up Appellant and began driving him toward Glenn Street, he became suspicious that Appellant would jump out of the cab near his destination and not pay the fare. Foster explained that he often requested fares in advance during the evening hours to prevent passengers from taking flight near their destinations without paying. Foster estimated that Appellant's fare would be approximately ten to twelve dollars, and asked Appellant to pay ten dollars toward the fare in advance. He testified that Appellant gave him only five dollars, and refused to advance any more. Foster testified that Appellant then demanded the money back, whereupon Foster returned the five dollars.

Foster testified that he told Appellant he would not drive any farther without the full fare in advance, and pulled to the side of the road. He stated that Appellant got out of the car and started walking away, and Foster honked the horn and asked him for the money he owed him for the completed portion of the trip. Foster testified that Appellant then turned around, walked back to the cab, pointed a gun at him, and said "Fuck you, give me your money." Foster further testified that he pressed the accelerator in his cab to try to get away, but this only revved the engine because the vehicle was in "park." According to Foster, Appellant fled when he heard the noise from the engine.

Foster then approached off duty Officer Bell of the Akron Police Department at a nearby service station and reported that somebody attempted to rob him. Foster provided a description of the suspect, and Officer Bell left the station in his cruiser to search for the assailant, with Foster following in his cab. Foster spotted Appellant walking on a nearby sidewalk, and honked his horn to indicate to Officer Bell that he was the man who had just tried to rob him. When Appellant saw Officer Bell he began to run, leaping over fences and darting through back yards. Officer Bell gave chase, and was soon joined by other Akron Police Department officers who had converged on the scene to look for the suspected robber. The police arrested Appellant shortly thereafter. Officers then began tracking the scene with a canine unit, which recovered a handgun from a woodpile in one of the yards Appellant had traversed.

**3. Detective Crystal Bowen testified that during her interview of Appellant after his arrest, Appellant admitted that the gun the police recovered belonged to him. Although Appellant denied to Officer Bowen that he had pulled a gun on Foster, Foster identified the gun recovered from the woodpile as the one Appellant used during the robbery.

[4] Appellant has argued that the testimony of Foster was not credible, and was contradicted by the testimony of Appellant's witness Teresha Griffin. Griffin testified that she watched Appellant exit the cab and Foster drive away,

Copyright (c) West Group 2003 No claim to original U.S. Govt. works

2002 WL 274634, State v. Tyler, (Ohio App. 9 Dist. 2002)

and that she did not see Appellant return to the cab or pull a gun on Foster. However, the jury had the opportunity to view the witnesses' testimony and adjudge their credibility; therefore, we must give deference to the jurors' judgments. See *State v. Lawrence* (Dec. 1, 1999), Lorain App. No. 98CA007118, unreported, at 13. Upon careful review of the testimony and evidence presented at trial, this Court cannot conclude that, given the evidence before it, the jury lost its way or created a manifest miscarriage of justice such that Appellant's conviction for aggravated robbery must be reversed. Appellant's contention that his conviction is against the manifest weight of the evidence is without merit.

This Court has previously noted that "[b]ecause *sufficiency* is required to take a case to the jury, a finding that a conviction is supported by the *weight* of the evidence must necessarily include a finding of sufficiency. Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Emphasis *sic*.) *State v. Roberts* (Sept. 17, 1997), Lorain App. No. 96CA006462, unreported, at 4. Accordingly, having found that Appellant's conviction is not against the manifest weight of the evidence, this Court need not discuss further his challenge to the sufficiency of the evidence. Appellant's assignments of error are overruled.

III

Appellant's assignments of error are overruled. The judgment of the trial court is affirmed.

*Judgment affirmed.*

The Court finds that there were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).

Costs taxed to Appellant.

Exceptions.

SLABY, P.J., and CARR, J., concur.

(FN1.) Although Appellant's assignments of error refer to "possession of cocaine," Appellant's arguments to this Court have challenged only his

Copyright (c) West Group 2003 No claim to original U.S. Govt. works

2002 WL 274634, State v. Tyler, (Ohio App. 9 Dist. 2002)

conviction for aggravated robbery.

Copyright (c) West Group 2003 No claim to original U.S. Govt. works

**A-6**